# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **THE WINNEBAGO TRIBE OF NEBRASKA**<br>100 Bluff Street,<br>Winnebago, NE 68071<br><br>PLAINTIFF,<br><br>v.<br><br>**UNITED STATES OF AMERICA;**<br><br>**ALEX M. AZAR II**, in his official capacity<br>as Secretary,<br>U.S. Department of Health & Human Service<br>200 Independence Ave, S.W.<br>Washington, DC 20201<br><br>**MICHAEL D. WEAHKEE**, in his official capacity<br>as Principal Deputy Director,<br>Indian Health Service<br>5600 Fishers Lane,<br>Rockville, MD 20857<br><br>**RYAN ZINKE**, in his official capacity<br>Secretary of the Interior<br>United States Department of the Interior<br>1849 C Street, NW<br>Washington, DC 20240<br><br>DEFENDANTS. | <br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br>Civil Action No.<br><br><br><br>**COMPLAINT** |

Served:   The Honorable Matthew Whitaker
          Acting Attorney General of the United States
          U.S. Department of Justice
          950 Pennsylvania Avenue, NW
          Washington, D.C.  20530-0001

          The Honorable Jessie K. Liu
          United States Attorney for the District of Columbia
          United States Attorney's Office
          555 4th Street, NW
          Washington, D.C.  20530

1

# **COMPLAINT**

The Plaintiff, for its cause of action against the Defendants named above, alleges as follows:

## I. INTRODUCTION AND SUMMARY

1. This is an action against the United States Indian Health Service (IHS) for damages arising from failure to pay Winnebago Tribe of Nebraska (Tribe) certain "contract support costs" (CSC) that were due under the Tribe's contracts with IHS in fiscal years 2006 through 2013. The Tribe's rights arise under its contracts with IHS and under the statute pursuant to which those contracts were awarded, the Indian Self-Determination and Education Assistance Act ("ISDEAA"), Pub. L. No. 93-638, as amended, 25 U.S.C. §§ 5301 *et seq*.

2. This action follows several United States Supreme Court decisions finding the federal government's failure to pay contractors such as the Tribe full CSC to be a breach of contract and violation of the law. See Salazar v. Ramah Navajo Chapter, 567 U.S. 182 (2012); Arctic Slope Native Ass'n v. Sibelius, 133 S. Ct. 22 (2012), on remand 501 Fed. App'x 957, 959 (Fed. Cir. 2012); Cherokee Nation v. Leavitt, 543 U.S. 631 (2005) (consolidated cases). This action is being filed after good faith but ultimately unsuccessful negotiations between the parties.

## II. JURISDICTION AND VENUE

3. This controversy arises under agreements between the United States and the Tribe for operation of Indian health programs carried out pursuant to ISDEAA. This Court has jurisdiction under 28 U.S.C. §§ 1331, 1362; 25 U.S.C. §§ 5331(a) and (d); and the Contract Disputes Act, 41 U.S.C. § 7104.

4.      On September 27, 2012, September 27, 2013 and May 8, 2018, the Tribe filed claims for reimbursement of its unpaid contract support costs incurred in FY 2006 through FY 2013. On December 7, 2017, IHS issued a decision denying the Tribe's FY 2006 through FY 2012 claims. On July 13, 2018, the Tribe's claims for FY 2013 were deemed denied pursuant to 41 U.S.C. §7103(f)(5).

5.      Venue is proper because Defendants Alex Azar and Ryan Zinke in their official capacities as Secretaries of HHS and DOI respectively are located in the District of Columbia.

### III.   PARTIES

6.      Plaintiff Winnebago Tribe of Nebraska is a federally recognized Indian Tribe with its headquarters located in the State of Nebraska. It is an "Indian tribe" as that term is defined in ISDEAA, 25 U.S.C. §5304 (e). At all times relevant to this complaint, the Tribe has contracted with IHS under ISDEAA to carry out a range of health care programs, functions, services and activities

7.      Defendant Ryan Zinke, the Secretary of the Department of Interior, has the federal responsibility to administer and oversee the Interior Business Center (the cognizant agency with which the Tribe negotiates its indirect cost rate), which rate is incorporated into the Tribe's contracts. See, e.g., 2008 Contract, AFA §5. He is sued in his official capacity.

8.      Defendant Alex M. Azar, the Secretary of HHS, has limited responsibilities delegated to him by Congress under ISDEAA and other applicable laws. He is sued in his official capacity. Defendant Rear Admiral Michael D. Weahkee is the Principle Deputy Director of the IHS. Principle Deputy Director Weahkee exercises authority delegated to him by the Secretary to carry out the Secretary's responsibilities under ISDEAA and other applicable laws. He is sued in his official capacity.

9.      Defendant United States is a party to the Tribe's ISDEAA agreements. See, e.g. 2008 Contract, (a)(1). Throughout this Complaint (unless the context commands otherwise), the terms "government," "Secretary," "HHS," "Acting Director," and "IHS" are used interchangeably.

## IV.    FACTS AND GENERAL ALLEGATIONS

### A.  The Contract Documents

10.     From FYs 2006 through 2013, the Tribe operated various IHS health care programs, functions, services and activities within its jurisdictional area to eligible Indians and other eligible beneficiaries pursuant to its Self-Determination contracts authorized by Title I of the ISDEAA (25 U.S.C. §§ 5301-5332.) From October 1, 2005 to September 30, 2008, the Tribe operated federal IHS programs pursuant to Contract No. 241-2006-00002 as authorized under to Title I of ISDEAA. From October 1, 2008 to September 30, 2011, the Tribe operated federal IHS programs pursuant to Contract No. 241-2009-00008, also authorized under Title I of ISDEAA. From October 1, 2011 to September 30, 2013, the Tribe operated federal IHS programs pursuant to Contract No. 241-2012-00003, also as authorized under Title I of ISDEAA. The tribally-operated federal IHS programs provided under these contracts include, among others, health administration, dental health, mental health and social services, community health representatives and services, alcohol and drug abuse prevention, and associated IHS programs, functions, services, and activates.

11.     The terms of the contracts are required by ISDEAA. All Title I contracts state that they "shall be liberally construed for the benefit of the Contractor . . . ." 25 U.S.C. §5329 (c) (model agreement § 1(a)(2)).

12.     The purpose of the contracts are to "transfer the funding and the following related functions, services, activities, and programs . . . including all related administrative functions, from the Federal Government to the Contractor . . . ." see Id.  To help carry out this purpose, the contracts incorporate ISDEAA Title I. See e.g. 2011 Contract at (a)(1).

13.     The contract documents also include the Tribe's funding agreements (FAs). FAs for Title I funds are issued annually. See e.g. 2011 Contract at (h)(2). Further, the FAs are often amended throughout the year to take account of new funds made available to the Tribe. The Tribe's FAs are fully incorporated into its contracts. See Id.

14.     The provisions at issue here are the Tribe's contracts, FAs, and modifications for fiscal years 2006 through 2013, and statutory and administrative provisions incorporated into the contracts by operation of law, including Title I of ISDEAA. See e.g. 2011 Contract at (a)(1).

### B.  The Contract Price

15.     ISDEAA authorizes the Tribe to assume responsibility to provide programs, functions, services and activities (PFSAs) that the Secretary would have otherwise provided and the Tribe has accepted those responsibilities by entering into the contracts at issue in this suit. In return, the Secretary must provide the Tribe with two types of funding under ISDEAA. First, the Secretary must provide "program funds" which "shall not be less than the appropriate Secretary would have otherwise provided for the operation of the programs . . . ." This is sometimes called the "Secretarial amount." Added to the Secretarial amount are "contract support costs" which are the reasonable administrative and overhead costs associated with carrying out the PFSAs. See 25 U.S.C. 5325(a). ISDEAA defines "contract support costs" with particularity.

### C.  Contract Support Costs

16. Contract support costs are mostly "administrative expenses." <u>Cherokee Nation</u>, 543 U.S. at 634. They are generally categorized as "indirect" contract support costs, or overhead costs applicable to more than one program, and "direct" contract support costs, which are those that benefit one particular program ("such as workers' compensation insurance." <u>Id.</u> (citing 25 U.S.C. §5325(a)(3)(A)(i)).

17. ISDEAA defines CSC more specifically as follows:

> [t]he contract support costs that are eligible costs for the purposes of receiving funding under this subchapter shall include the costs of reimbursing each tribal contractor for reasonable and allowable costs of –
>
> > (i) direct program expenses for the operation of the Federal program that is the subject of the contract, and
> > (ii) any additional administrative or other expense related to the overhead incurred by the tribal contractor in connection with the operation of the Federal program, function, service, or activity pursuant to the contract,
>
> Except that such funding shall not duplicate any funding provided under subsection (a)(1) of this section.

§5325(a)(3)(A). Thus, ISDEAA obligates IHS to pay "reasonable and allowable costs" of "direct program expenses" plus "any additional administrative or other expense related to the overhead incurred by the tribal contractor in connection with the operation of the Federal [PFSAs]." <u>Id.</u> The only limit on this payment obligation is that a CSC payment shall not duplicate an amount paid in the Secretarial amount (that is, the amount "provided under subsection (a)(1) of this section.")

18. Title I of ISDEAA states that the Secretary may not "impose any nonregulatory requirement related to self-determination contracts" and limits the Secretary's authority to promulgate regulations to sixteen designated subjects specified in the act. Contract support costs are not one of these subjects. <u>Ramah Navajo School Bd. v. Babbitt</u>, 87 F.3d 1338, 1344 (D.C. Cir. 1996). <u>See also, e.g.,</u> 2011 Contract at (b)(11) ("Except as specifically provided in

the Indian Self-Determination and Education Assistance Act . . . the Contract is not required to abide by program guidelines, manuals, or policy directives of the Secretary, unless otherwise agreed to by the Contractor and the Secretary, or otherwise required by law.").

19. During the years at issue, IHS used the Indian Health Manual (the "IHS Manual") to determine how CSCs are calculated.

20. The IHS Manual reflects ISDEAA's mandate that, upon approval of the contract, "the Secretary shall add to the contract the full amount of funds to which the contractor is entitled [under section 106(a) of ISDEAA]," including CSC. 25 U.S.C. §5325 (g).

21. During the years at issue here, the IHS manual stated as follows:

> Throughout the operation of the program by the awardee, <u>total contract costs (including CSC) are eligible to be paid as either direct or indirect costs</u>. Since Tribes often operate more than one program, many of the costs incurred by the awardee are paid through an indirect cost allocation process, usually negotiated by the "Federal Agency" as identified under the applicable [OMB] Circular. . . . [ISDEAA] authorizes awardees to be paid CSC costs whether they are "indirect" in nature (benefiting multiple programs) or additional costs associated with operating a single program, except that such funding shall not duplicate any funding provided [under the Secretarial amount].

IHS Manual, §6-3.2(B) (emphasis added).

22. For the Tribe, the "total contract costs" as it pertains to indirect costs was determined by the DOI's Interior Business Center under that IHS Manual by multiplying a negotiated indirect cost rate by the amount of the direct cost base, (See IHS Manual, §6-3.2(E)(1)), the direct cost base having been established after the Tribe and IBC agreed to treat a specific set of costs as passthroughs and exclusions.

### D. Contract Support Costs Shortfalls

23. IHS applied the Tribe's indirect cost rate to determine the amount of indirect contract support costs due to the Tribe each year. It did not, however, apply the rate to the Tribe's full direct cost base used to provide services under the Tribe's contracts with IHS. IHS

7

only applied the rate to the portion of the direct cost based funded with IHS appropriations. It did not apply the rate to that portion of the base funded with third-party revenues the Tribe generated under 25 U.S.C. §§1621e and 1621f and used for the provision of PFSAs under the contracts. IHS thus failed to provide the administrative costs associated with the Tribe's programs funded with third-party revenue even though the costs are a key component of the contracts and in lieu of the contract would have been collected and expended by the Secretary for the services covered by the contracts. Thus, this amount would have been "otherwise provided" and expended by the Secretary had IHS run the health-care programs. 25 U.S.C. §5235(a)(1). See also Pyramid Lake Paiute Tribe v. Burwell, 70 F. Supp. 3d 534, 544 (D.D.C. 2014) ("the applicable funding level for a contract proposal under [ISDEAA] is determined based on what the Secretary otherwise would have spent, not on the source of the funds the Secretary uses."); Navajo Health Found. –Sage Mem'l Hosp., Inc. v. Burwell, 263 F.Supp. 3d 1083, 1166-67 (D.N.M. 2016).

24. Furthermore, IHS failed to fund even that portion of the indirect contract support costs owed under its own deficient calculation. Therefore, IHS failed to reimburse the Tribe for the administrative and overhead costs owed on those PFSAs carried out under the Tribe's contracts which were funded with IHS appropriated dollars.

25. ISDEAA also requires IHS to fully reimburse the Tribe for direct contract support costs. 25 U.S.C. §5325 (a)(3)(A)(i). Nothing in the statute limits the amount of direct contract support costs reimbursed to those amounts previously negotiated with IHS. Rather, the statute requires the Tribe receive an amount equal to "the reasonable and allowable costs of . . . direct program expense for the operation of the Federal program that is the subject of the contract." Id. Thus the Tribe is entitled to be reimbursed the full amount of direct contract

support costs incurred during the years in question, without regard to any prior agency estimates of the amount IHS believed it owed.

26. IHS failed to reimburse the Tribe for its full direct and indirect contract support costs incurred in FYs 2006-2013.

### E. Other Damages

27. As noted, the Tribe generated third-party revenue and then used that revenue to provide services under its contracts. IHS's failure to fully fund the Tribe's indirect contract support costs for FYs 2006-2013 at the same level that the Secretary would have expended caused the Tribe to divert program dollars to cover fixed administrative and overhead costs. These program dollars would, in turn, have been available for additional program services. This caused the Tribe direct harm from the loss of third-party revenue and the loss of services as well as the additional third party revenue that would have been generated from those services.

28. Diversion of program dollars and the resulting loss of third-party revenues were foreseeable consequences of CSC underpayments. See U.S. Gov't Accountability Office, GAO-99-150, Indian Self-Determination Act: Shortfalls in Indian Contract Support Costs Need to be Addressed 40-41 (1999) (describing the use of medical program resources to cover unpaid CSC).

29. IHS's breaches of the FY 2006 through 2013 contracts directly caused the Tribe foreseeable damages in the form of lost third-party revenue.

30. Additionally, the under-recoveries of CSC on a fixed carryforward rate should operate to increase a future year's rate to pay back a previous year's loss. Instead, they are moved into an arbitrary "shortfall" column, unjustifiably excluding them from normal carryforward rate calculations. This practice violates the minimum funding requirement of 25

U.S.C. §5325(a), the ban on "theoretical over-recoveries or other adverse adjustment" set forth in section 5325(d), and the provision governing use of surplus recoveries by tribal contractors under section 5325(a)(4). Also, in establishing the indirect cost rate, a carryforward adjustment is made to the indirect cost pool twice.[1] A carryforward adjustment is first made (that is, carryforward is removed from the indirect cost pool) during the negotiation of the initial rate. It is then removed a second time during the negotiation of the rate for the period two years subsequent. This causes the rate of the current year to be adversely effected by the carryforward adjustment from two years prior, even though that carryforward adjustment was already accounted for during that year's negotiation.

31. This violation of ISDEAA directly caused the Tribe harm through the failure to restore shortfall dollars in the carryforward template and making a carryforward adjustment to the indirect cost pool twice.

### F. Procedural History of the Claims

32. On September 27, 2012, September 27, 2013, May 8, 2018 the Tribe timely filed claims for reimbursement of its unpaid contract support costs incurred in FY 2006 through FY 2013.

33. IHS denied the Tribe's claims for FYs 2006-2012 by letter dated December 7, 2017. In that letter, IHS makes a counterclaim seeking a refund of $60,544 for FYs 2006-2010 due to "passthrough and exclusions . . . not taken into account . . . ." This demand for

---

[1] "The indirect cost pool is the accumulated costs that jointly benefit two or more programs or other cost objectives." https://www.doi.gov/ibc/services/finance/indirect-cost-services/faqs. Further, "a carry forward adjustment is the amount required to reconcile the difference between the estimated costs and the actual costs incurred for the agreed-upon time period." Id.

repayment ignored the definition and calculation of passthroughs and exclusions utilized by the Interior Business Center and the Tribe in establishing the Tribe's indirect cost rate.

34. The Tribe's claims for FY 2013 were deemed denied pursuant to 41 U.S.C. §7103(f) 60 days after the contracting officer received the claim, or on July 13, 2018.

35. The Tribe filed this action within 12 months after receipt of the IHS decision and the deemed denial, as authorized by the Contract Disputes Act. 41 U.S.C. § 7104(b)(3). The Tribe challenges both the denials of its claims and IHS's counterclaim.

36. The IHS and Tribe have engaged in settlement negotiations and exchanged informal discovery in an effort to resolve these claims without litigation. As of the filing of this Complaint, these efforts have been unsuccessful.

### G. Rule of construction

37. The Supreme Court has found that contracts made under ISDEAA "'shall be liberally construed for the benefit of the Contractor....' " Salazar, 567 U.S. at 194 (quoting 25 U.S.C. §5329 (citation updated) (model agreement § 1(a)(2)). The Salazar Court continued as follows: "The Government, in effect, must demonstrate that its reading is clearly required by the statutory language." Id.

## V.   COUNT I-BREACH OF CONTRACT (CSC)

38. The Tribe alleges and incorporates by reference the allegations contained in paragraphs 1-37 above.

39. The Tribe's contracts required the Secretary to fully fund the Tribe's CSC. See, e.g. 2011 Contract, §f (3)(G) (referencing ISDEAA section 106, 25 U.S.C. §5325). This duty was affirmed by Ramah and Cherokee, *supra*.

40. By failing to pay direct and indirect CSC, IHS breached its contractual agreements with the Tribe.

41. As a result of IHS's breach of its contractual agreements, the Tribe sustained damages totaling $1,318,070. These damages are more fully delineated as follows:

|  | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 |
|---|---|---|---|---|---|---|---|---|
| indirect CSC shortfalls | $129,496 | $177,152 | $79,840 | $158,546 | $76,795 | $50,769 | $331,780 | $240,677 |
| direct CSC shortfalls | $10,445 | $10,627 | $9,047 | $10,704 | $13,008 | $3,234 | $15,950 | $0 |

42. IHS's breaches of the FY 2006 through 2013 contracts also caused the Tribe damages in the form of lost third-party services and revenues (LTP), as well as lost indirect CSC on unpaid direct CSC due and owing to the Tribe under the contracts (IDC). These damages were caused by the government, were a foreseeable result of underpaying contract support costs, and are quantifiable. Specifically the Tribe sustained damages in an additional amount of $231,082 resulting from the government's breaches. These damages are more particularly set out as follows:

|  | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 |
|---|---|---|---|---|---|---|---|---|
| LTP | $12,786 | $13,565 | $12,985 | $18,990 | $77,057 | $20,042 | $67,888 | $0 |
| IDC | $1,007 | $1,192 | $1,002 | $993 | $1,108 | $322 | $2,145 | $0 |

43. In order to remedy IHS's breach of its contractual obligations under Count I, the Tribe is entitled to damages of no less than $1,549,152.

**VI.   COUNT II-BREACH OF CONTRACT (Carryforward)**

44. The Tribe alleges and incorporates by reference the allegations contained in paragraphs 1-43 above.

45. The practice of the government of moving under recoveries to an arbitrary "shortfall" column during the years in question, thereby excluding them from normal fixed carryforward rate calculations, and caused foreseeable harm by decreasing future years' rates and denying indirect contract support costs due and owing to the Tribe (Template). These rates were negotiated with the Interior Business Center and incorporated into the contracts for FY 2006 through FY 2013 entered into between the Tribe and the government. See, e.g., 2008 Contract, AFA §5.

46. Additionally, in establishing the Tribe's indirect cost rate, carryforward is removed from the indirect cost pool twice (Double Dipping). It is removed during the negotiation of the initial rate and then removed a second time during the negotiation of the rate for the period two years subsequent. This causes the rate of the current year to be adversely effected by the carryforward from two years prior, even though that carryforward was already accounted for during that year's negotiation.

47. The damages resulting from this breach are quantifiable. Specifically, the Tribe sustained damages in the amount of $560,572, which are more fully delineated as follows:

|  | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 |
|---|---|---|---|---|---|---|---|---|
| Double Dipping | $ 38,832 | $ 1,558 | $53,918 | $21,583 | $107,569 | $42,241 | $ 2,919 | $42,854 |
| Template | $ 0 | $ 0 | $22,433 | $30,498 | $ 55,122 | $29,568 | $50,102 | $41,375 |

48. In order to remedy the Government's breach of its contractual obligations under Count II, the Tribe is entitled to damages of no less than $560,572, plus interest and attorneys' fees and costs, all as specifically prayed below.

## VII. COUNT III-BREACH OF STATUTORY RIGHT

49. The Tribe alleges and incorporates by reference the allegations contained in paragraphs 1-48 above.

50. ISDEAA creates a right of action for money damages to remedy the Secretary's breach of his obligations arising under the statute. 25 U.S.C. 5331.

51. Under 25 U.S.C. 5325(a)(2)-(3) the Secretary in FY 2006 through 2013 had a statutory duty to pay the Tribe full contract support costs.

52. The Secretary failed to pay the Tribe no less than $1,318,070 in contract support costs due in FY 2006 through FY 2013.

53. The Tribe also lost an additional amount of $791,654 as a result of this statutory violation.

54. In order to remedy the Secretary's breach of his statutory obligations, the Tribe is entitled to damages of no less than $2,109,724, plus interest and attorneys' fees and costs, all as specifically prayed below.

## VIII. PRAYER FOR RELIEF

WHEREFORE, the Tribe prays:

    (a) For a declaratory judgment that in FY 2006 through 2013 the Secretary acted in violation of ISDEAA by failing to pay the Tribe the full amount of contract support costs that the Tribe was due under its contracts with the Secretary;

    (b) For a declaratory judgment that in FY 2006 through 2013 the Secretary breached its contracts with the Tribe by failing to pay the Tribe's full contract support cost requirement;

(c) For a money judgment of $2,109,724;

(d) For interest for one year form the date each unpaid amount comprising the $2,109,724 was due, as provided for under the Prompt Payment Act, 31 U.S.C. §§3901-3907;

(e) For interest under the Contract Disputes Act, 41 U.S.C. §§7101-7109, from the date each claim was filed to the date of final payment made pursuant to a judgment of this Court;

(f) For costs and attorneys' fees incurred in pursuing this claim, as provided for under the Equal Access to Justice Act, 5 U.S.C. §504; 28 U.S.C. § 2412; ISDEAA, 25 U.S.C. § 5331(c), and other applicable law; and

(g) Such other monetary, declaratory, and equitable relief as this Court may find to be just.

Respectfully Submitted,

/s/ Brandt Benjamin Fenner
Patricia Marks (DC Bar No. 446702)
Brandt Benjamin Fenner (DC Bar No. 1011266)
Fredericks Peebles & Morgan LLP
401 9th Street NW, Suite 700
Washington, DC  20004
202-450-4887 (Tel.)
202-450-5106 (Fax)

Attorneys for the Winnebago Tribe of Nebraska

DATED: December 7, 2018